**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
ALBANY DIVISION**

| | |
|---|---|
| CHERYL ANN FRYER, | : |
| Plaintiff, | : |
| v. | : CASE NO.: 1:11-CV-147 (WLS) |
| THE TRUSTEES OF THE PROCTER & GAMBLE LONG TERM DISABILITY ALLOWANCE POLICY and THE PROCTER & GAMBLE LONG TERM DISABILITY ALLOWANCE POLICY, | : |
| Defendants. | : |

## **ORDER**

Before the Court are Plaintiff's and Defendants' Motions for Judgment. (Docs. 15, 16.) For the reasons that follow, Defendants' motion is **GRANTED**, and Plaintiff's motion is **DENIED**.

### **I.   Procedural Background**

Plaintiff Cheryl Ann Fryer (Fryer) brought suit against the Procter & Gamble Long Term Disability Allowance Policy and its trustees (the Trustees) under the Employee Retirement Security Act of 1974 (ERISA). She seeks to recover disability benefits from an employee benefits plan sponsored by her employer, the Procter & Gamble Company (P & G). Her primary claim is that the Trustees wrongfully classified her chronic pain syndrome and post lumbar laminectomy syndrome as a partial disability, rather than a total disability, under the plan terms.

On October 15, 2012, the Parties filed cross motions for judgment. (Docs. 15, 16.) In support of their motions, the Parties refer to the undisputed administrative record.

1

After a review of the motions and record, the Court grants judgment in favor of the Trustees.

## II. Findings of Fact

Fryer is a former papermaking technician at P & G in Albany, Georgia. (PG 427.) During her employment, she was a participant in the Procter & Gamble Disability Benefit Plan (the Plan). The Plan provided fifty-two weeks of short-term disability payments for partial disabilities. (PG 463.) It defined a "Partial Disability" as follows:

> "*Partial disability*" means a mental or physical condition resulting from an illness or injury because of which the Participant is receiving medical treatment and cannot perform regular duties of his or her current job but can perform other roles at the same site or other jobs outside of the Company. Thus, a condition of Partial Disability does not necessarily prevent the Participant from performing useful tasks, utilizing public or private transportation, or taking part in social or business activities outside the home.

(PG 453.) The Plan defined a "Total Disability" as:

> [A] mental or physical condition resulting from an illness or injury which is generally considered totally disabling by the medical profession and for which the Participant is receiving regular recognized treatment by a qualified medical professional. Usually, Total Disability involves a condition of such severity as to require care in a hospital or restriction to the immediate confines of the home. The Trustees reserve the right to determine what is considered as "regular" and "recognized treatment."

The Plan gave the Trustees discretionary authority to interpret the Plan, review requests for benefits, and determine eligibility for benefits. (PG 465.) The Plan also stated, "It is the Participant's burden to establish by objective medical evidence that he or she is either totally or partially disabled, as the terms are defined in the plan." (PG 461.)

In 2007, Fryer began suffering back and hip pain. She underwent back surgery in June 2007. After the surgery, Fryer experienced lower back pain that radiated to her

2

legs. In December 2007, she returned to light-duty work at P & G and to full-duty work in March 2008. Throughout 2008, however, Fryer continued to experience back and hip pain.

In September 2009, Fryer left work. She began receiving total disability benefit payments September 14, 2009, for chronic pain syndrome and post lumbar laminectomy syndrome. (PG 5.) By letter dated January 19, 2009, the Trustees informed Fryer she would begin receiving partial disability instead of total disability payments beginning December 21, 2009. (PG 393.) In support of this determination, the Trustees noted that "[y]our treating physician, Dr. Charity Wilson, has indicated that you can return to work with the following restrictions of eight hours per day, five days per week with no lifting greater than 20 pounds, no standing greater than 5 minutes, no sitting greater than 10 minutes, and no bending or stooping." (*Id.*)

Fryer received partial disability payments from December 21, 2009 through March 30, 2010. (PG 236.) She returned to work March 31, 2010, after her department indicated it could accommodate her restrictions. (*Id.*) Fryer soon left work again. In an April 28, 2010 letter, the Trustees again determined Fryer was partially disabled and entitled to receive benefits, commencing April 5, 2010. (*Id.*)

In April and May 2010, Dr. Lamar Moree, a pain specialist, noted that Fryer's pain had worsened since returning to work. (PG 287.)

On August 30, 2010, Fryer appealed the Trustee's determination that she was partially disabled. (PG 229–35.)

Dr. Wilson, who practices family medicine, submitted a Long-Term Disability Status Report on September 23, 2010. (PG 104.) In her report, Dr. Wilson concluded that Fryer had lumbar disc disease and a poor prognosis. She could not return to work

3

in any capacity. Dr. Wilson further reported that the condition required medications that may sedate Fryer.

The Trustees referred Fryer's file and record to Dr. Milton Klein, who specializes in osteopathy, for a peer review. (PG 443–46.) On September 28, 2010, after a review of Fryer's history and medical reports, Dr. Klein concluded, "there is no objective medical information documented to substantiate an inability to work in any capacity including sedentary at P&G or with any other employer." In Dr. Klein's opinion, Fryer could perform full-time light duty work. Dr. Klein also opined that Fryer could work April 15, 2010 forward with restrictions.

Patrick Gay, a registered physical therapist, performed a functional capacity evaluation (FCE) on Fryer November 4, 2010. (PG 429–31.) Gay noted that Fryer "demonstrated pain behaviors such as crying, grimacing, sighing and guarded movements," but also demonstrated "dramatic effect and fluctuation of pain," "which do not correlate with the anatomy and physiology of pain." Further, Fryer "was willing to attempt most tests but was not able/willing to complete the test and proceed to the next higher weight or next test." He concluded, "The results of this evaluation indicate that [Fryer's] FCE test is invalid, does not represent her maximum physical capabilities and cannot be used for watching her abilities with her job requirements." Nevertheless, Gay reported that "[t]hough the results of the FCE were clearly skewed by symptom exaggeration and self limiting behavior [sic], it is my professional opinion that [Fryer] classifies for work in light category."

On November 16, 2010, following an in-person examination, Dr. Mark Wolgin of Orthopedic Associates in Albany, Georgia, submitted an independent medical evaluation for Fryer. (PG 436–40.) He reported that Fryer had herniation of various discs and

4

residual discogenic pain. He opined that "she basically needs to live with this condition or have it fixed." Dr. Wolgin felt Fryer would be a candidate for surgery. He concluded that "part-time sedentary work would be something she could potentially do." He added, "I believe that once her symptoms began to be more severe in the summer of 2009, she could have participated in desk-type work without lifting or frequent bending or twisting. She probably could have lifted 5-10 pounds occasionally and could probably continue with that work through the present." Dr. Wolgin also noted that the FCE was invalid because she was asked to perform tests that would not have been attempted on a patient with spinal pathology.

On December 17, 2010, the Trustees denied Fryer's appeal. (PG 62–63.) The denial letter explained that the results of the independent medical evaluation indicated that Fryer could perform sedentary work. In a January 7, 2011 letter, the Trustees further informed Fryer she had exhausted her fifty-two weeks' partial disability payments on December 22, 2010. (PG 61.)

Fryer appealed this determination July 8, 2011. (PG 11.) In support of her appeal, Fryer submitted a Residual Functional Capacity Questionnaire from Dr. Wilson. Dr. Wilson reported that Fryer experienced constant pain and could sit and walk less than two hours each workday.

At the direction of counsel, Fryer underwent a FCE with Keith Blankenship, a physical therapist. (PG 13–17.) Blankenship reported that Fryer "did not demonstrate any competitive work ability at this time." "Her maximum Standing/Walking tolerance is only 45 min. and her maximum Sitting tolerance is only 60 mins., and she has to be able to control her symptoms by getting off her feet or lying down when she needs to be

able to do so." Blankenship also noted that Fryer could frequently sit and occasionally stand and walk. He reported she was capable of driving short distances.

Fryer's counsel also referred Fryer's medical file to Earl Thompson, a vocational consultant. (PG 38–48.) Thompson opined that, "within a reasonable degree of vocational certainty," Fryer was incapable "of performing the essential job functions of any full-time job at any skill or physical demand level."

After Fryer's appeal, Dr. Michael Errico, an orthopedic surgeon, reviewed Fryer's file at the Trustee's request. (PG 52–58.) In an August 2, 2011 letter, Dr. Errico reported that "[t]he medical information supports that she should be able to perform a sedentary job." He also concluded, "The medical reports do not substantiate an inability to work with or without restrictions from 12/22/10 on. . . . With a sedentary job it should be reasonable for her to sit for a period of one hour, with ability to change position or move around as necessary every hour." He concluded that Fryer "was not totally disabled (i.e. totally precluded from work activity) during the time period from 12/22/10 forward."

Upon receipt of Blankenship's and Thompson's reports, Dr. Errico wrote an addendum to his first review. In the addendum, he reported that "[t]he additional information does not alter my opinion from the original report." He concluded, "I do not think the records provided justified their use of the term 'total disability,' as there is no medical evidence to support that the claimant requires care in the hospital and there is no indication that she was restricted 'to the immediate confines of the home.'"

On August 25, 2011, the Trustees denied Fryer's appeal.

### III. Discussion

"In an ERISA benefits denial case . . . in a very real sense, the district court sits more as an appellate tribunal than as a trial court. It does not take evidence, but, rather,

evaluates the reasonableness of an administrative determination in light of the record compiled before the plan fiduciary." *Curran v. Kemper Nat'l Servs., Inc.*, No. 04-14097, 2005 WL 894840, at *7 (11th Cir. Mar. 16, 2005) (quoting *Leahy v. Raytheon Co.*, 315 F.3d 11, 17–18 (1st Cir. 2002)).

A plan administrator's adverse benefits determination is entitled to deference when the administrator possesses discretionary authority. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 111 (1989). Although ERISA itself does not provide standards for reviewing a plan administrator's discretionary decision, the Eleventh Circuit, relying on Supreme Court precedent, has developed a six-part approach:

> (1) Apply the *de novo* standard to determine whether the claim administrator's benefits-denial decision is "wrong" (i.e., the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.
>
> (2) If the administrator's decision in fact is "*de novo* wrong," then determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.
>
> (3) If the administrator's decision is "*de novo* wrong" and he was vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard).
>
> (4) If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.
>
> (5) If there is no conflict, then end the inquiry and affirm the decision.
>
> (6) If there is a conflict, the conflict should merely be a factor for the court to take into account when determining whether an administrator's decision was arbitrary and capricious.

*Blankenship v. Metro. Life Ins. Co.*, 644 F.3d 1350, 1355 (11th Cir. 2011). "At each step, the court makes a determination that results in either the progression to the next step or

the end of the inquiry." *Tippitt v. Reliance Standard Life Ins. Co.*, 457 F.3d 1227, 1231–32 (11th Cir. 2006).

## A. Whether the Trustees' decision was wrong

The Court first analyzes whether the Trustees' decision was wrong. "A decision is 'wrong' if, after a review of the decision of the administrator from a *de novo* perspective, 'the court disagrees with the administrator's decision.'" *Glazer v. Reliance Standard Life Ins. Co.*, 524 F.3d 1241, 1246 (11th Cir. 2008) (quoting *Williams v. BellSouth Telecomm., Inc.*, 373 F.3d 1132, 1138 & n.8 (11th Cir. 2004)). After a review of the record, the Court concludes that the Trustee's determination was *de novo* correct.

The administrative record reveals that Fryer was not totally disabled. The Plan defined a "Total Disability" as an illness or injury "generally considered totally disabling by the medical profession." It further states, "Usually, Total Disability involves a condition of such severity as to require care in a hospital or restriction to the immediate confines of the home." In contrast, a "Partial Disability" means

> a mental or physical condition resulting from an illness or injury because of which the Participant is receiving medical treatment and cannot perform regular duties of his or her current job but can perform other roles at the same site or other jobs outside of the Company. Thus, a condition of Partial Disability does not necessarily prevent the Participant from performing useful tasks, utilizing public or private transportation, or taking part in social or business activities outside the home.

(453.)

At least three specialists opined that Fryer could perform sedentary work. Following an in-person examination, Dr. Wolgin, an orthopedist, felt that "the patient could return any time [to work] if sedentary work were available." He opined that "once her symptoms began to be more severe in the summer of 2009, she could have participated in desk-type work without lifting or severe bending or twisting. She probably could have

8

lifted 5-10 pounds occasionally and could probably continue with that work through the present." Despite these conclusions, Fryer dwells on Dr. Wolgin's statement that "part-time sedentary work would be something she could potentially do" to support a claim that she was totally disabled. Dr. Wolgin, however, made that statement as a recommendation for a transitional work schedule. He also said no less than seven times that Fryer could probably do sedentary work.

During a peer review, Dr. Klein, who practiced osteopathic medicine and spinal cord rehabilitation, found there to be "no objective medical information documented to substantiate an inability to work in any capacity including sedentary at P&G or with any other employer." Dr. Errico, an orthopedic surgeon, opined that Fryer was not totally disabled. He concluded that "[t]he medical information supports that [Fryer] should be able to perform a sedentary job." He also believed that Blankenship's and Thompson's uses of the term "total disability" were unwarranted.

In contrast, although Dr. Wilson, Blankenship, and Thompson all concluded that Fryer was incapable of work, none of these professionals were as qualified to opine on orthopedic issues as Drs. Wolgin and Errico. Dr. Wilson practices family medicine, and Blankenship and Thompson are not physicians. Moreover, Blankenship's work evaluation notes that Fryer could engage in "frequent" sitting and "occasional" standing and walking. He also noted she could drive short distances. Blankenship found that Fryer could sit for 60 minutes and "has to be able to control her symptoms by getting off her feet *or* lying down when she needs to be able to do so." Thus, Blankenship's findings are arguably consistent with the conclusion that Fryer could do sedentary work.

In short, a majority of the evidence does not support a finding that Fryer was totally disabled. The Social Security determination does not change the Court's conclu-

9

sion, as it involved different question. The evidence strongly supports a determination that Fryer could perform work within and outside of P & G, could engage in other useful tasks, and was capable of using private transportation. In contrast, although it does not automatically disqualify her from long-term benefits, there is little to no evidence Fryer was confined to the home or needed care in a hospital.

### B. Whether the Trustees abused their discretion

Even if the Trustees' determination was *de novo* wrong, it was not arbitrary, capricious, or an abuse of discretion. The Trustees had discretion to interpret the plan, so their decision must be accorded deference. *Blankenship*, 644 F.3d at 1355 (citations omitted). "As long as a reasonable basis appears for [the] decision . . . it must be upheld as not being arbitrary or capricious, even if there is evidence that would support a contrary decision." *White v. Coca-Cola Co.*, 542 F.3d 848, 857 (11th Cir. 2008) (quoting *Jett v. Blue Cross & Blue Shield of Ala., Inc.*, 890 F.2d 1137, 1140 (11th Cir.1989)).

As previously noted, the administrative record contains ample evidence to provide a reasonable basis for classifying Fryer as partially, rather than totally, disabled. The general thrust of Dr. Wolgin's report was that Fryer had functional impairments but could perform a sedentary job. Likewise, Dr. Errico, an orthopedic surgeon, concluded "it is clear that [Fryer] has problems with her neck and back," but the "medical information supports that she could be able to perform a sedentary job." He also opined that "[t]he medical records do not substantiate an inability to work with or without restrictions." "With a sedentary job it should be reasonable for her to sit for a period of one hour, with ability to change position or move around as necessary every hour." Blankenship, Fryer's consultant, independently reached an almost identical conclusion regarding Fryer's sitting ability.

10

Likewise, Dr. Klein found that "there is no objective medical information documented to substantiate an inability to work in any capacity including sedentary work." Dr. Klein opined that Fryer could perform light-duty work. He concluded, "Based upon my review of the objective medical information, the claimant is capable of working with restrictions."

Clearly, Fryer prefers the conclusions of her treating physicians. But unlike Drs. Wolgin and Errico, Fryer's treating physicians are not orthopedists. And "[p]lan administrators need not accord extra respect to the opinions of a claimant's treating physicians." *Blaneknship*, 644 F.3d at 1356 (citing *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 830–31 (2003)). "It is entirely appropriate for an administrator to rely on written reports of consultants who have done paper reviews of a claimant's medical records." *McInvale v. Metropolitan Life Ins. Co.*, No. 5:07-cv-459, 2009 WL 2589521, at *8 (M.D. Ga. Aug. 18, 2009) ((quoting *Hufford v. Harris Corp.*, 322 F. Supp. 2d 1345, 1359 (M.D. Fla. 2004)). The Trustees' determination was not unreasonable simply because they credited the conclusions of one expert over another. *See Paramore v. Delta Air Lines, Inc.*, 129 F.3d 1446, 1452 (11th Cir. 1997) (holding that plan administrator's denial of long-term disability benefits was reasonable even though two physicians provided inconsistent statements about whether the claimant could perform sedentary work).

Furthermore, it is simply not true, as Fryer claims, that the Trustees ignored evidence from her consultants and treating physicians. To the contrary, the Trustees explicitly considered the reports from her treating physicians and provided these materials to their consultants. (*E.g.*, PG 5.) One denial letter states that the "Trustees have reviewed all of the information provided to them in support of your claim for disability

11

benefits." (PG 62.) Dr. Errico even made an addendum to his initial review after the Trustees gave him Blankenship's and Thompson's reports.

Fryer also argues that the Trustees' decision was arbitrary and capricious because they relied on a physician, Dr. Klein, who couched his opinions in whether "objective evidence" supported a finding that she was totally disabled. This argument is unpersuasive. Under the Plan, it was Fryer's burden "to establish by *objective* medical evidence that . . . she is either totally or partially disabled, as the terms are defined in the Plan." (PG 461 (emphasis added).) Because the Plan required proof by objective medical evidence, it would not have been unreasonable to discount subjective reports of pain. *See Doyle v. Liberty Life Assur. Co. of Boston*, 542 F.3d 1352, 1358 (11th Cir. 2008) (holding that it was not unreasonable for plan administrator to ignore intangible pain and suffering when plan called for proof of "objective medical evidence"). In any event, there is no evidence the Trustees gave special weight to Dr. Klein's report. Drs. Wolgin and Errico both considered Fryer's prescription drug use and subjective reports of pain.

Given the wealth of evidence supporting that Fryer could perform sedentary work, the Court cannot conclude that the Trustees' determination was arbitrary and capricious, even taking into account the possibility of a conflict of interest.[1]

---

[1] *But see Gilley v. Monsanto Co.,* 490 F.3d 848, 856 (11th Cir. 2007) ("Our circuit law is clear that no conflict of interest exists where benefits are paid from a trust that is funded through periodic contributions so that the provider incurs no immediate expense as a result of paying benefits.").

## IV. CONCLUSION

For those reasons, Defendants' Motion for Judgment (Doc. 15) is **GRANTED.** Plaintiff's Motion for Judgment (Doc. 16) is **DENIED**. Judgment shall be entered in favor of Defendants.

**SO ORDER'ED**, this   25th   day of September 2013.

  /s/ W. Louis Sands
**THE HONORABLE W. LOUIS SANDS,
UNITED STATES DISTRICT COURT**